# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

SONJA C.,[1]

       **Plaintiff,**

v.                                            **Civil Action No. 2:22-cv-514**

KILOLO KIJAKAZI
ACTING COMMISSIONER OF
SOCIAL SECURITY,

       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff Sonja C. seeks judicial review of the Commissioner of Social Security's denial of her claim for Title XVI Supplemental Security Income ("SSI") benefits under the Social Security Act ("the Act"). Specifically, Plaintiff argues that the Commissioner's Administrative Law Judge ("ALJ") failed to rely on any medical opinion evidence and inserted his own lay medical opinion. As a result, she argues that the ALJ's residual functional capacity ("RFC") is not supported by substantial evidence. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this Report recommends that the court deny Plaintiff's motion for summary judgment, (ECF No. 11), and affirm the final decision of the Commissioner.

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

# I.    PROCEDURAL BACKGROUND

Plaintiff initially filed for SSI under Title XVI of the Act on March 5, 2020. (R. 112). She originally alleged disability beginning March 5, 2001,[2] (R. 224), based on diabetes; arthritis in neck and shoulders; left knee and hip pain; limited movement, left elbow pain; asthma; post-traumatic stress disorder, GERD, acid reflux, liver problems. and high blood pressure. (R. 253). The state agency denied her application initially (R. 112) and on reconsideration (R. 114). Plaintiff then requested an administrative hearing, (R. 187) which was held on September 16, 2021. (R. 69–92). Counsel represented Plaintiff at the hearing, and a vocational expert ("VE") testified. On January 19, 2022, the ALJ denied Plaintiff's claim for SSI, finding that she was not disabled during the period alleged. (R. 11–27). On October 13, 2022, the Appeals Council denied Plaintiff's request for review. (R. 1–7).

On December 13, 2022, Plaintiff filed her complaint in this court. Compl. (ECF No. 1). Plaintiff seeks judicial review of the Commissioner's final decision that she was not entitled to an award of SSI, claiming that "[t]he conclusions and findings of fact of the [Commissioner] are not supported by substantial evidence and are contrary to law and regulation." Id. at ¶ 8. On April 19, 2023, Plaintiff moved for summary judgment. (ECF No. 11). Plaintiff argues that the case should be reversed and remanded because the ALJ failed to rely on the medical opinions in the record and instead inserted his own lay medical opinion. Pl.'s Mem. Supp. Mot. Summ. J. ("Pl.'s Mem.") (ECF No. 12, at 8–12). On May 19, 2023, the Commissioner opposed Plaintiff's motion.[3]

---

[2] Plaintiff amended her disability onset date to March 5, 2020, at her disability hearing. (R. 75). In her application for Social Security Benefits, submitted in 2020, Plaintiff stated she has not previously filed an application with the Social Security Administration. (R. 224).

[3] In opposing Plaintiff's motion, the Commissioner did not move for summary judgment. However, under the new Supplemental Rules for Social Security Actions, effective December 1, 2022, appeals from final decisions of the Social Security Administration are presented for decision by the parties' briefs. Supp. R. Soc. Security Actions Under 42 U.S.C. § 405(g), Rule 5. As both parties have filed their briefs on this matter pursuant to the undersigned's Briefing Order, (ECF No. 8), this matter is ripe for review notwithstanding the absence of cross-motions for summary judgment.

Def's Br. Supp. Decision Denying Disability Benefits ("Def.'s Br.") (ECF No. 14).   The Commissioner argues that the ALJ's decision is supported by substantial evidence because the ALJ considered the medical record, Plaintiff's daily activities, and the supportability and consistency of the medical opinions in the record when determining that Plaintiff can perform light work with limitations.   Id. at 15–21.   Plaintiff replied.   ("Pl.'s Reply") (ECF No. 15).   After a review of the record, this Report considers each of these arguments.

## II.   FACTUAL BACKGROUND

Plaintiff was born on June 12, 1969, and at the time of the ALJ's decision, she was 52 years old.   (R. 76, 250).   She has not engaged in substantial gainful activity since March 5, 2020, the amended alleged onset date.[4]   (R. 13).   She has a GED and reported past work as a firewatcher, store associate, and movie theater employee.   (R. 76, 263–70).

### A.   Plaintiff's Health Treatment

Plaintiff's arguments in this court do not require a complete review of her medical history as she disputes only the ALJ's assessment of her medical history and related opinion evidence since on, or around, March 5, 2020, her alleged onset date.

### 1.   Plaintiff's Medical Visits and Treatments

On February 27, 2020,[5] Plaintiff was evaluated by orthopedist David D. Alcantara, M.D., at the Virginia Orthopedic and Spine Specialists ("VOSS") for neck and shoulder pain she reported experiencing the past four years.   (R. 836).   Plaintiff rated her pain a 10/10 (with 10 being the worst).   Id.   Dr. Alcantara referred Plaintiff to physical therapy and noted that her symptoms may

---

To the extent the Commissioner's brief, (ECF No. 14), seeks summary judgment in the Commissioner's favor, the undersigned recommends that the court GRANT the motion.

[4] Plaintiff amended her disability onset date to March 5, 2020, at her disability hearing.   (R. 75).

[5] Although this appointment occurred prior to Plaintiff's alleged onset date, this medical evaluation is relevant to Plaintiff's subsequent disability determination.

be due to cervical myofascial pain at least partially compensatory for a bilateral shoulder pathology, likely her rotator cuff.  Id.  Dr. Alcantara stated Plaintiff may have a component of sensory hypersensitivity given her diffuse symptoms.  Id.  Dr. Alcantara examined Plaintiff and found her cervical spine revealed limited range of motion but normal muscle tone, no focal atrophy, and grossly intact sensation in her bilateral arms to light touch. (R. 839).  Further, Dr. Alcantara found Plaintiff's lumbar spine exhibited mild tenderness to palpitation, but she had no pain regarding her hip range of motion, she enjoyed full range of motion in her spine, and exhibited grossly intact sensation to light touch in the bilateral legs.  Id.  Dr. Alcantara finally noted that Plaintiff had full motor strength in all extremities, she had no gait difficulties, and she ambulated without a cane or other assistive device.  Id.

On March 5, 2020, Plaintiff was admitted at the Virginia Beach Psychiatric Center.  (R. 600–03).  Plaintiff was previously discharged from the facility on January 24, 2020, but was instructed by her therapist to return "for continuing suicidal thoughts."  (R. 600).  During her admission, Plaintiff "reported ongoing voices," "paranoia and significant anxiety but no panic attack[s]."  Id.  On March 8, Plaintiff "did not endorse suicidal ideation," but on March 9, she reported "suicidal ideation comes and goes and that she is still very depressed." (R. 602).  Plaintiff also reported chronic pain in her knees and hips but no "joint or muscle pain" on March 6.  (R. 601, 604).  During her treatment, Plaintiff "attended group therapy and interacted with her peers." (R. 602).  Plaintiff received medication throughout her stay, including Risperdal prior to sleep.  Id. On March 9, 2020, her "auditory hallucinations were slightly improved."  Id.  The next day, March 10, Plaintiff reported she was "seeing shadows" and her she agreed to increase her Risperdal dosage before sleep.  Id.  Also on March 10, Plaintiff stated her depression was "okay," and less severe.  Id.  Plaintiff's sister "had no concerns for discharge."  Id.  Plaintiff was discharged on

4

March 11, 2020, and "reported that she felt stable at this time." Id. Plaintiff's discharge summary included psychiatric diagnoses of major depression recurrent, severe, with psychotic features and posttraumatic stress disorder. (R. 603). Her medical diagnoses included type 2 diabetes, vitamin D deficiency, chronic hip and knee pain, and gastroesophageal reflux disease. (R. 602–03). Plaintiff was prescribed Risperdal, Prozac, Trazodone, and Vistaril. (R. 603). Her prognosis was marked as good, and she had "[n]o limitation" in physical activity. (R. 602–03).

On April 1, 2020, Plaintiff had a virtual follow-up appointment with her primary care provider Jo-Anna Guzman-Lee, M.D. (R. 831). During the appointment, Dr. Guzman-Lee evaluated Plaintiff's chronic conditions including: type 2 diabetes mellitus with hyperglycemia and long-term current use of insulin, vitamin D deficiency, essential hypertension, moderate persistent asthma without complication, severe depression, gastroesophageal reflux disease without esophagitis, tubular adenoma of colon, primary osteoarthritis of left-knee, primary osteoarthritis of left hip, and obesity, morbid. (R. 831–32). Plaintiff was negative for suicidal ideations, reported no hallucinations, and her mental status exam did not indicate abnormalities. (R. 833–34). Dr. Guzman-Lee provided Plaintiff with prescription refills and recommended she follow-up in three months. (R. 832).

The following week, on April 7, 2020, Plaintiff was evaluated by Jaime Leah N. Lynch, physical therapist ("PT"), at the DePaul Medical Center for physical therapy. (828–30). Plaintiff reported shoulder pain over the past three years which has progressively worsened. (R. 828). Plaintiff also reported neck, hip, foot, and ankle pain. Id. Plaintiff stated she was not taking any regular medication for pain and was not using any home modalities to deal with pain. Id. Plaintiff noted that she sleeps on her side but has trouble feeling comfortable. Id. Plaintiff shared that she has trouble reaching, carrying items, and carrying her purse over her shoulder. Id. Dr. Lynch

5

provided Plaintiff with a home exercise program to address her bilateral shoulder and neck pain. (R. 830). Dr. Lynch noted Plaintiff is obese. (R. 829). Dr. Lynch advised Plaintiff that her long-term goals are "[t]o be accomplished in four treatments," including one treatment for the next four weeks. Id. The physical therapy plan included exercises to increase Plaintiff's range of motion and reduce pain. Id.

On April 9, 2020, Plaintiff had a ten-minute telehealth appointment with Dr. Guzman-Lee and reported that she started physical therapy and was given exercises to perform at home. (R. 824). Plaintiff reported her pain level a 7/10. Id.

On April 16, 2020, Plaintiff attended her second physical therapy appointment at the DePaul Medical Center. (R. 821). During the appointment, Plaintiff reported "a little soreness" from her at-home exercises and "tennis elbow (right) from hitting her elbow really hard." (R. 822). Plaintiff rated her pain a 7/10, but stated she has "decreased pain intensity after modality." Id.

On April 27, 2020, Plaintiff reported for physical therapy at the DePaul Medical Center and stated that her neck was still causing pain and her left hip and knee started "hurting again." (R. 1067). Plaintiff reported "decreased symptoms" in her neck "for a couple of hours after PT sessions" and "a little increased tolerance to therapeutic exercise." Id. Plaintiff also reported "no delayed onset muscle soreness after therapeutic activity/manual." (R. 1069). Overall, Plaintiff reported her pain level a 5/10. (R. 1067). The treating PT found Plaintiff had increased shoulder range of motion but continued to experience pain. (R. 1068).

On April 28, 2020, a member of Dr. Guzman-Lee's staff called Plaintiff and informed her that her labs did not show rheumatoid arthritis. (R. 1066). The following month, on May 15, 2020, Plaintiff had a consultation with rheumatologist John R. Dye, M.D., for a rheumatologic review. (R. 1007). Plaintiff reported she has osteoarthritis and degenerative disc disease ("DDD")

6

affecting her cervical spine as well as "OA in her hip and knee." (R. 1007–08). Dr. Dye encouraged Plaintiff to continue losing weight and noted that he could not offer "much" regarding Plaintiff's neck problem because he is a rheumatologist. (R. 1008). Dr. Dye prescribed Meloxicam and Zanaflex. Id. Dr. Dye noted that Plaintiff visits Dr. Shah for her "chronic tennis elbow." Id.

On May 12, 2020, Plaintiff returned to physical therapy at the DePaul Medical Center. (R. 1061). Plaintiff reported her pain before treatment a 6/10, and her post-treatment pain a 4/10. (R. 1062). Plaintiff's report noted that she was supposed to attend an appointment the previous week but was unable to appear. Id.

On May 18, 2020, Plaintiff was examined at Sentara Hand Surgery VA Beach by Hassan M. Shah, M.D., for right lateral epicondylitis and right small finger pain. (R. 1001). Dr. Shah recommended Plaintiff modify her activities and avoid repetitive wrist extension and lifting with the forearm in pronation. (R. 1001–02). Plaintiff reported constant pain in her hand with a pain level of 3/10, and a sharp pain in her hand that results from overactivity at a pain level of 5/10. (1002). Dr. Shah discussed the benefits and risks associated with wearing a "tennis elbow band" and noted Plaintiff could receive a steroid injection, which Plaintiff agreed. Id. Dr. Shah also discussed surgery and stated it "may not provide any benefit" or relief from symptoms. Id. Dr. Shah prescribed Plaintiff Mobic/meloxicam–15 mg once a day. Id.

On May 19, 2020, Plaintiff had an appointment with Wilford Gibson, M.D., at Atlantic Orthopaedic Specialists for her hip and knee issues. (R. 958). Plaintiff was referred to Dr. Gibson by Dr. Guzman-Lee. Id. Plaintiff reported trouble with her hip "for over a year now" and was using a cane. Id. Plaintiff localized pain in her groin. Id. Plaintiff also described marked pain that limits her activities and reported that she can walk 2-3 blocks in 15 minutes. Id. Plaintiff

stated she uses public transportation or a ride service.  Id.  Plaintiff has a license, but no vehicle. Id.  Plaintiff had a moderate limp and stated she is unable to navigate stairs or sit comfortably in a chair.  Id.  Dr. Gibson noted Plaintiff is overweight and should lose weight.  (R. 959).  Dr. Gibson also recorded that Plaintiff drinks alcohol, "maybe 3 [three] times a month."  Id.  Dr. Gibson examined Plaintiff and opined that "she is a heavyset woman," and she can use her "arms overheard."  (R. 959).  Dr. Gibson observed that Plaintiff rotates her "low back stiffly," her right hip is stiff, and her left hip is "minimally painful."  Id.  Dr. Gibson found Plaintiff can stand and weight shift "without any severe pain" and walks "limping favoring the left hip."  Id.

Dr. Gibson also reviewed x-rays of Plaintiff's pelvis and left hip which showed "changes in the left femoral neck and subtrochanteric region consistent with a pinning of a femoral neck fracture of slipped capital femoral epiphysis perhaps."  Id.  Dr. Gibson further observed Plaintiff had "a calcified labrum on the right hip," which he did not find on her left hip.  Id.  Rather, Dr. Gibson noted that her left hip "joint spaces are still fairly well preserved."  Id.  Finally, based on the x-rays, Dr. Gibson found "there is loss of sphericity around 90 degrees on the lateral and on the AP view confirming significant cam lesion likely from a prior slipped capital femoral epiphysis."  Id.  Dr. Gibson noted that Plaintiff reported significant pain, and "that most of it seems to be coming from the hip joint."  (R. 960).  Dr. Gibson recommended Plaintiff get an MRI of her left hip to see if there is a labral tear.  Id.  Dr. Gibson's assessment included a left hip femoral acetabular impingement with cam lesion and labral tear.  (R. 959).

On May 27, 2020, Plaintiff attended her seventh physical therapy appointment.  (R. 1057). During this visit, Dr. Lynch recommended that therapy be discontinued due to lack of appreciable progress towards her goals.  (R. 1057–58).  Dr. Lynch noted that Plaintiff reported minimal

changes in her symptoms since starting physical therapy, but that Plaintiff's "reports [of] fair to poor overall HEP [home exercise program] compliance [is] likely contributing." (R. 1057).

On June 4, 2020, Plaintiff had a follow-up appointment with Dr. Alcantara at VOSS. (R. 1053). On examination, Dr. Alcantara noted Plaintiff had no gross deformities, misalignment, or asymmetry in her head, neck, spine, ribs, pelvis, or upper extremities. (R. 1056). Dr. Alcantara recommended Plaintiff receive an MRI of her cervical spine. (R. 1054). Plaintiff subsequently had an MRI on June 12, 2020. (R. 1071). According to the MRI results, Plaintiff's cervical spine showed multilevel disc disease with various degrees of canal stenosis, greatest at C5-C6 with moderate cord distortion but no abnormal cord signal. (R. 1072). On June 30, 2020, Plaintiff had a follow-up appointment with Dr. Alcantara, and he reviewed Plaintiff's MRI. (R. 1047–48). Dr. Alcantara reviewed the MRI report, and restated the findings of multilevel disc disease which produces various degrees of canal stenosis, greatest at Plaintiff's C5-6 where there is moderate cord distortion, but no abnormal cord signal. (R. 1048). Dr. Alcantara reiterated that Plaintiff has a lesser degree of stenosis elsewhere, and potentially significant foraminal narrowing on the right at C4-5 and C5-6. Id. Dr. Alcantara provided Plaintiff with a referral for cervical interlaminar injections and recommended Plaintiff continue her home exercise program. Id.

On July 8, 2020, Plaintiff was evaluated by Dr. Guzman-Lee for a follow-up regarding her type two diabetes, essential hypertension, moderate persistent asthma, severe depression, vitamin D deficiency, and DDD. (R. 974). Dr. Guzman-Lee reviewed the abovementioned MRI of Plaintiff's cervical spine and restated the MRI report. (R. 975). Dr. Guzman-Lee noted that Plaintiff is obese. (R. 977). Dr. Guzman-Lee recommended Plaintiff follow-up in three months to evaluate her chronic conditions, and recorded that Plaintiff had a pain management appointment for later that day. (R. 978, 983).

On August 10, 2020, Plaintiff had had an appointment with Dr. Shah at the Sentara Hand Surgery Specialists, for her right lateral epicondylitis, or "tennis elbow." (R. 994–95). Dr. Shah informed Plaintiff that epicondylitis "is very frustrating [] to resolve," and "[o]ften, regardless of the option undertaken (including surgery), many patients still have pain." (R. 995). Plaintiff reported her elbow pain level a 4/10, and stated she did not have any shoulder pain. (R. 996). Plaintiff reported neck pain. Id.

On August 31, 2020, Plaintiff returned to the DePaul Medical Center for physical therapy following a recommendation from Dr. Guzman-Lee. (R. 1040). Plaintiff reported that her "pain is worse with walking, standing, and she is unable to do stairs due to her knee pain." Id. Plaintiff reported that she "typically walks with SPC for community," but is limited to walking one block. Id. Plaintiff stated that she "forgot her cane at home today." Id. Plaintiff also reported pain in her left knee and neck which impact her mobility. Id. The treating PT stated Plaintiff's goal is to "be independent and compliant with" her home exercise program and Plaintiff should attend physical therapy one to two times per week for four to six weeks. (R. 1040–41).

On October 20, 2020, Plaintiff was evaluated by Dr. Alcantara at VOSS. (R. 1131). Dr. Alcantara noted Plaintiff received two cervical injections from a different doctor, and "is finding continued benefit from the second" injection. Id. Plaintiff reported her pain a 2/10. (R. 1132).

On November 9, 2020, Plaintiff had a follow-up appointment with Dr. Gibson. (R. 1298). Dr. Gibson noted Plaintiff gained weight since her last appointment. (1299). Dr. Gibson reviewed Plaintiff's x-rays and found her "joint space still looks fairly well preserved compared to the right hip and she has fair coverage." Id. Dr. Gibson reported included that he "let her know, at this point, [he] believe[s] the best is to focus on getting the weight down through diet." Id.

On November 30, 2020, Plaintiff underwent a psychiatric evaluation at Christian Psychotherapy Services, and was diagnosed with several new conditions. (1328). Plaintiff was evaluated by Sanford P. Martin, EdD, LPC, psychological examiner, who conducted objective and subjective testing. (1328–1335). Plaintiff was diagnosed with major depressive disorder with psychotic features, post-traumatic stress disorder, neurocognitive disorder, dissociative disorder, generalized anxiety disorder, schizoaffective disorder, and attention deficit disorder, secondary to neurocognitive disorder. (R. 1334).

The next month, on December 9, 2020, Plaintiff was evaluated by Dr. Charles E. Shuff, M.D. (R. 1294). Dr. Shuff reviewed Plaintiff's x-rays and found her "lumbar spine show[s] preserved lordosis," and she has "[a]dvanced degenerative changes of the L3-4, L4-5 disk without listhesis or soft tissue abnormality." Id. Dr. Shuff noted there is "no particular evidence of fracture or pars defect," but she does have "posterior facet disease." Id. In his treatment plan, Dr. Shuff noted "the bulk of her complaints seem to be more hip related than spine," and that he defers to "Dr. Gibson with regard to her ultimate treatment." (R. 1295).

On December 30, 2020, Plaintiff had an appointment at the DePaul Medical Center—In Motion Physical Therapy—for back pain. (R. 1302). After her initial evaluation, Plaintiff failed to appear for any further physical therapy, and her treatments were discontinued in February 2021. Id.

On February 5, 2021, Plaintiff had an appointment with Dr. Alcantara at VOSS where she underwent an electrodiagnostic examination and nerve conduction studies. (R. 1152). Dr. Alcantara noted that her electrodiagnostic examination was abnormal and "may be consistent with" mild median mononeuropathy at the right wrist (carpel tunnel syndrome) and ulnar nerve abnormality. (R. 1152). On February 23, 2021, Plaintiff was evaluated by Dr. Huttman at VOSS.

11

(R. 1164).  Dr. Huttman reviewed Plaintiff's x-rays and MRI and noted in his assessment that Plaintiff complained of right-side neck pain, and he does not believe it is "coming from her shoulder."  (R. 1169).  Dr. Huttman recommended physical therapy and an oral anti-inflammatory."  Id.

In April 2021, Plaintiff had a right carpal tunnel release. (R. 1196).  In May 2021, Plaintiff reported "some tenderness: and that "numbness is still present and only minimally better since surgery." (R. 1204).  That same month, Plaintiff returned to Dr. Huttman seeking treatment for her right elbow. (R. 1216).  Plaintiff had three x-rays of her right elbow which showed, according to Dr. Huttman, "some calcification off of the lateral epicondyle but no other significant abnormalities." Id.  In June 2021, Dr. Huttman recommended Plaintiff attend physical therapy for her right elbow. (R. 1242).

Later, in August 2021, Plaintiff saw Dr. Gibson for back pain.  (R. 1351).  Dr. Gibson stated he did not recommend a hip replacement given her young age and "fairly stable appearance of the hip." (R. 1352).  Dr. Gibson noted in his treatment plan that he wants Plaintiff to continue working on losing weight.  Id.

**B.      Opinion Testimony**

**1.      David Bristow, M.D.**

On July 21, 2020, non-examining State Agency medical consultant David Bristow, M.D., reviewed Plaintiff's medical records and a report from a field office interview.  (R. 106).  Dr. Bristow stated that Plaintiff "[a]lthough [she] has normal exams from 2/2020 and more limiting exams from 5/2020, diagnostic data would confirm left hip femoral acetabular impingement with cam lesion and labral tear with b/l hip arthrosis . . . and morbid obesity." Id.  Dr. Bristow further noted Plaintiff has left knee and hip arthritis, left ankle mild to moderate degenerative changes,

and right elbow tendinosis.  (R. 105).  Dr. Bristow reviewed "[t]he field office face to face interview" which noted "no limitations in her sitting, standing, walking, writing or using her hands," and "no assistive device for ambulation."  (R. 106).  Dr. Bristow found that Plaintiff reported "pain all of the time" and "use of a non-prescribed cane to take pressure off her knee when walking long distances."  Id.  Dr. Bristow further observed that Plaintiff reported "no personal care limitations" and that she is able to "prepare light meals . . . light chores, travel via riding or medical transport, [and] shops in stores with [her] sister."  Id.  Plaintiff reported that she is "unable to lift bags due to her elbow and shoulder," and cannot "stand for long periods."  Id.

After completing his review, Dr. Bristow then determined Plaintiff can perform light work with the following limitations: occasionally lift/carry 20 lbs.; frequently lift/carry 10 lbs.; stand/walk for a total of 6 hours in a eight-hour workday; sit for a total of 6 hours in an eight-hour workday; occasionally push/pull with left lower extremity; occasionally climb ramp/stairs, balance, stoop, kneel, and crouch; never climb ladders/ropes/scaffolds and crawl; and avoid concentrated exposure to extreme cold/heat, humidity, pulmonary irritants, and hazards. (R. 104–106, 110).

### 2.    Robert McGuffin, M.D.

On reconsideration, Dr. Robert McGuffin, M.D., non-examining State Agency Medical consultant, independently reviewed Plaintiff's medical records.  (R. 129–33).  Dr. McGuffin completed his evaluation on December 4, 2020. (R. 133).  Dr. McGuffin agreed with Dr. Bristow that Plaintiff could perform light work, and included the following limitations: occasionally lift/carry 20 lbs., frequently lift/carry 10 lbs., stand/walk for a total of six hours in an eight-hour workday, sit for six hours in an eight-hour workday, occasionally push/pull with her left lower extremities, occasionally climb ramps/stairs and crouch, occasionally balance and kneel, never

13

climb ladders or crawl, and avoid concentrated exposure to extreme cold/heat, humidity, pulmonary irritants, and hazards.  (R. 129–30).

### 3.    Zack Stearns, M.D.

Dr. Zack Stearns, an independent medical expert specializing in orthopedic surgery, reviewed Plaintiff's medical records and provided an expert opinion.  (R. 1412).  Dr. Stearns completed his evaluation on December 6, 2021.  (R. 1414).  Dr. Stearns identified Plaintiff's impairments as:

> Primary OA left hip, h/o SCFE, tear of left acetabular labrum, BMI 40.0-44.9, DDD lumbar spine, primary OA left knee, chronic left hip pain [], asthma, DM type II, GERD [], major depressive disorder with psychotic symptoms, PTSD, mild cognitive impairment, other dissociative and conversion disorders, generalized anxiety disorder, schizoaffective disorder-bipolar type, ADHD [], bilateral foot and ankle pain with posterior tibial tendonitis.

(R. 1412).  Dr. Stearns found that none of Plaintiff's impairments established by the medical evidence, combined or separately, met or equaled any impairments described in the Listing of Impairments.  (R. 1413).  In support of this finding, Dr. Stearns referenced reports in the record including an exam concerning Plaintiff's lumbar degenerative disc disease, where she had equal strength 5/5, no straight leg raise or radicular findings, and only subtle hip discomfort during rotation.  Id.  Dr. Stearns also cited to instances in the record where Plaintiff had "no significant back trouble," "full range of motion" in her left knee and "[r]esponding to cortisone injections," "unremarkable" lumbar spine x-rays, "MRI left hip: joint space well preserved," "x-rays [show] left hip stable"; and "[n]o EMG evidence."  (R. 1412–13).

In Dr. Stearns' medical statement of Plaintiff's ability to do work-related activities, he reported Plaintiff can lift and carry up to 20 lbs. continuously, can carry 21 to 50 lbs. frequently, and can occasionally carry 51 to 100 lbs.  (R. 1415).  Dr. Stearns stated Plaintiff

can sit, stand, and walk for four hours without interruption. (R. 1416). He further noted Plaintiff can sit, stand, and walk six hours in an eight-hour workday. Id. Dr. Stearns documented that Plaintiff reports using a case but noted that her "history and physical findings would not indicate a medical necessity" for the cane. Id. Additionally, Dr. Stearns found Plaintiff can use both of her hands continuously to reach, handle, finger, feel, push, and pull. Id. Dr. Stearns noted that Plaintiff can operate foot controls continuously with both her right and left foot. (R. 1417). Regarding postural activities. Dr. Stearns found that Plaintiff can continuously balance, frequently climb stairs and ramps, and occasionally stoop, kneel, crouch, and crawl. (R. 1418). Dr. Stearns also found that Plaintiff can never climb ladders or scaffolds. Id. Finally, Dr. Stearns noted that Plaintiff's environmental limitations, like her ability to continuously operate a vehicle and tolerate humidity and wetness, "apply to the majority of people." (R. 1419).

## C. Testimony Before the ALJ

The ALJ questioned Plaintiff at the hearing on September 16, 2021. (R. 71–87). The ALJ also heard testimony from the vocational expert ("VE") Herman Bates. (R. 87–91).

### 1. Plaintiff's Testimony

On direct questioning by the ALJ, Plaintiff testified that she is single and currently lives with her sister who is sixty-three years old. (R. 76). She reported earning her GED and past work in 2019 as a shipyard fire watcher and a movie theater ticket salesperson. (R. 86–87).

Plaintiff testified that she has PTSD, depression, and anxiety. (R. 78–79). She testified that she has depression "[a] couple of times a week," experiences panic attacks "not that often … maybe once a week," and has anxiety daily. (R. 78). She stated that she takes medication to help her sleep, but experiences PTSD-related nightmares "twice a week" and has fatigue every day. (R.

15

78–79).  Plaintiff testified that she has attention deficit disorder and has had trouble focusing and concentrating since she was a child.  (R. 79).  Plaintiff stated that she takes medication for her attention deficit disorder.  Id.  Plaintiff testified that she had issues with alcohol in the past and drank most recently on January 1, 2021.  Id.  Plaintiff further testified that she has diabetes, has "a hard time keeping" her sugar levels down, and has liver damage.  (R. 80.).

Plaintiff also discussed her orthopedic pain issues.  Id.  Plaintiff testified that she is treating with Dr. Gibson at Atlanta Orthopedic for knee and hip pain.  Id.  Plaintiff stated she receives cortisone shots in her knee and hip from Dr. Gibson, and that Dr. Gibson told her "the cartilage in [her] knee is breaking up."  (R. 80–81).  Plaintiff testified that Dr. Gibson suggested a hip replacement, but that he will not perform the surgery until she loses more weight.  (R. 81).

For her neck and spine issues, Plaintiff testified that she is treated by Dr. Alcantara at Virginia Orthopedic.  Id.  She testified that she has arthritis in her neck, and "a disc coming out of the vertebrae of [her] neck ... pushing up against [a] nerve."  Id.  Additionally, Plaintiff testified that she is seeing Dr. Wilson at Virginia Orthopedic for her carpal tunnel, and that she had carpal tunnel surgery on her dominant, right hand.  Id.  Plaintiff testified that she needs carpal tunnel surgery on her left hand.  (R. 82).  Plaintiff further testified that her right-hand carpal tunnel surgery did not result in any improvement, and that her hand is "weaker" today.  Id.  Plaintiff testified she has trouble opening bottles of water and turning the doorknob on her front door.  Id.  Plaintiff stated she can lift and carry a small bag of groceries in her right hand and can pick up a small pot. Id.  But, Plaintiff said she cannot lift anything heavy with her right hand.  Id.  Regarding her left hand, Plaintiff said it "is numb" but she can lift "a little bit more" compared to her right hand.  Id.

Finally, concerning her physical impairments, Plaintiff testified that she experiences hip and lumbar pain which prevents her from sitting for long periods of time.  Id.  Plaintiff testified

that she can "sit up in a regular chair with [her] feet on the floor" for five to ten minutes before needing to change positions. (R. 82–83). When asked by the ALJ what bothers her after five to ten minutes in a chair, Plaintiff stated that "[i]t's just very uncomfortable" and both her hip and lower back "hurts." (R. 83). Further, Plaintiff testified that she can stand for ten to fifteen minutes before needing to change positions. Id. Finally, Plaintiff testified that she can only walk "less than a block" before she must "stop and take a break." Id.

Next, the ALJ asked Plaintiff about her typical day from 9am to 5pm since March 2020. Id. Plaintiff testified that between 9am to 1pm, she needs three, thirty-minute breaks where she lays down and elevates her legs. (R. 84). From 1pm to 5pm, Plaintiff reported requiring approximately two, thirty-minute breaks. Id.

The ALJ then asked about her work history, and specifically asked her to explain why she has had "a lot of job" for short durations. (R. 85). Plaintiff stated that her mental health issues affect her concentration and focus at work, and that she has trouble attending or "showing up for work." Id. Plaintiff shared that while working at the shipyard, she had suicidal thoughts, and "almost jumped off a ship., but somebody pulled [her] back." Id. Plaintiff testified that she stopped appearing for work at the shipyard in 2019 because she had outpatient knee surgery and could no longer climb stairs. (R. 86). Additionally, Plaintiff shared that most of her jobs "were through temp[orary] services," and she would stop attending. (R. 85). For example, in 2019, Plaintiff testified that she stopped attending her job as a movie theater ticket salesperson because she felt overwhelmed. (R. 86). Plaintiff stated that she held this position for about sixty days. Id. At the conclusion of her testimony, Plaintiff stated that, aside from the medical conditions covered during her testimony before the ALJ, there were no other conditions preventing her from working. (R. 86–87).

17

## 2.    Testimony from the VE

The VE described Plaintiff's temporary work in the shipyard as "that of a fire watch," and further classified this position in the DOT as a shipyard laborer (DOT 809.687-022). (R. 87). The DOT defines a shipyard laborer's exertional demand as heavy, but the VE testified that Plaintiff "most likely performed at the medium exertional level." Id. The VE then classified Plaintiff's work as a ticket seller (DOT 211.467-030), which includes a light exertional demand. Id. The VE also classified two job positions included in Plaintiff's materials, but not mentioned during Plaintiff's direct testimony. Id. First, the VE characterized Plaintiff's work as a salesclerk (DOT 290.477-014), and explained that this position entails a light exertional demand. Id. Lastly, the VE characterized Plaintiff's work as a salesperson for women's apparel and accessories (DOT 261.357-066), and provided that this job includes a light exertional demand. Id.

The ALJ's hypothetical for the VE posited a person with the same age, education, and work experience as Plaintiff with the following limitations:

> [T]his individual is limited to light work. The individual is limited to occasional pushing and pulling, walking no longer than 1 block at a time on a flat, even surface. The individual would need sit/stand options, sit or stand up to 30 minutes at a time before changing positions for a few minutes. The individual has to avoid crawling and climbing ladders, ropes, or scaffolds but can perform other postural movements occasionally. The individual is limited to simple, routine, definitive, low stress status. Low stress is defined as requires work no more than occasional change in her routine and work allows the individual to avoid fast pace status such as assembly lines or production orders. The individual is limited to occasional interaction with the public, coworkers and supervisors. Is limited to frequent fingering, grasping, handling, and reaching. Has to avoid work around hazards such as moving, dangerous machinery and unprotected heights. Avoid concentrated exposure to respiratory irritants and extreme temperatures and humidity.

(R. 88–89). The VE testified that the hypothetical individual could not perform any of Plaintiff's past jobs. (R. 89). The VE testified that the hypothetical individual could perform other light jobs, including merchandize marker (DOT 209.587-034) with 129,000 jobs nationally; mail sorter (DOT

209.687-026) with 13,000 jobs nationally; and photocopy machine operator (DOT 207.685-014) with 25,000 jobs nationally.  Id.  The VE further testified that the hypothetical individual could perform the above-mentioned jobs even if she could not stand for "longer than 15 minutes at a time" and could only "stand and walk a total of four hours within an eight-hour day."  (R. 90). The VE testified that the outlined "jobs typically allow free reign in terms of alternating between sitting and standing."  (R. 91).  Finally, the VE testified that if the hypothetical person was limited to "no direct interaction with the public," she could still perform the enumerated jobs.  Id.

### III.    STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence.  42 U.S.C. § 405(g); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but the evidence may be somewhat less than a preponderance.  Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).[6]

The court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner.  Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)."  Craig, 76 F.3d at 589.  The

---

[6] The standard of review provided herein addresses the concerns raised in Plaintiff's Reply, (ECF No. 15, at 1–2).

Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390; see also Lewis v. Berryhill, 858 F.3d 858, 868 (4th Cir. 2017). Ultimately, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.   ANALYSIS

Plaintiff brief identifies one error in the ALJ's decision that she claims warrant remand. Plaintiff contends that the ALJ's findings are unsupported by substantial evidence because he failed to rely on any medical opinion evidence and instead inserted his own lay medical opinion. Pl.s Mem. (ECF No. 12, at 1). As explained below, this Report finds no error in the ALJ's analysis. Accordingly, this Report concludes that remand is not warranted, and therefore recommends that the court affirm the Commissioner's decision.

### A.   Framework for SSA Disability Evaluation

Title XVI of the Act provides supplemental security income benefits to "financially needy individuals who are aged, blind, or disabled regardless of their insured status." Bowen v. Galbreath, 485 U.S. 74, 75 (1988) (citing 42 U.S.C. § 1382(a)). As relevant here, the Act defines "disability" as the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); accord 20 C.F.R. § 416.905(a). An impairment renders an individual disabled only if it is so severe as to prevent the person from engaging in his or her prior work or any other substantial gainful activity that exists in the national economy. See 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.905(a).

20

SSA regulations set out a sequential analysis which ALJs use to make their determination. 20 C.F.R. § 416.920(a)(4).  Specifically, the regulations direct the ALJ to answer the following five questions:

1.  Is the individual involved in substantial gainful activity?

2.  Does the individual suffer from a severe impairment or a combination of impairments that meets the durational requirement and significantly limits his or her physical or mental ability to do basic work activities?

3.  Does the individual suffer from an impairment(s) that meets or equals a listing in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (a "listed impairment") and meets the durational requirement?

4.  Does the individual's impairment or combination of impairments prevent him or her from performing any relevant past work?

5.  Does the individual's impairment or combination of impairments prevent him or her from performing any other work?

An affirmative answer to question one, or a negative answer to questions two, four, or five, means the claimant is not disabled.  An affirmative answer to questions three or five establishes disability.  The claimant bears the burden of proof during the first four steps; if the analysis reaches step five, the burden shifts to the Commissioner to show that other work suitable to the claimant is available in the national economy.  See Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995); Jolly v. Berryhill, No. 16-cv-38, 2017 WL 3262186, at *6 (E.D. Va. July 13, 2017).

The SSA considers all material evidence in evaluating whether a claimant is disabled.  20 C.F.R. §§ 416.920(a)(3); 416.920b. This includes "(1) the objective medical facts; (2) the diagnoses and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age."  Jolly, 2017 WL 3262186, at *6 (citing Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967)).  Ultimate responsibility for making factual findings and weighing the evidence rests

with the ALJ. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990) (citing King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979)).

**B.    The ALJ Decision Currently Before the Court for Review.**

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity from her alleged disability onset date until the hearing date.  (R. 13).  At step two, the ALJ found that Plaintiff suffered from the following severe impairments:

> osteoarthritis and allied disorders of multiple joints including hips, left knee, and right elbow; disorders of the hips, left knee, and cervical and lumbar spine; bilateral carpal tunnel syndrome; left cubital tunnel syndrome; diabetes mellitus; asthma; obesity; major depressive disorder; post-traumatic stress disorder ("PTSD"); generalized anxiety disorder; schizoaffective disorder; dissociative disorder; and attention-deficit hyperactivity disorder ("ADHD") (20 CFR 416.920(c)).

(R. 13).  At step three, the ALJ found that Plaintiff did not suffer from a listed impairment or combinations of impairments that met or medically equaled the severity of one of the listed impairments.  The ALJ developed a finding regarding Plaintiff's RFC.  He determined Plaintiff was able:

> to perform light work as defined in 20 CFR 416.967(b) except as follows.  The claimant is limited to occasional pushing and pulling.  The claimant can walk no longer than one block at a time on a flat even surface.  The claimant can sit or stand up to 30 minutes at a time before changing positions for a few minutes.  The claimant has to avoid crawling, kneeling and climbing ladders, ropes, and scaffolds, but she can perform other postural movements occasionally.  The claimant is limited to simple, routine, repetitive and low-stress tasks, with low stress defined as requiring work with no more than occasional change in the routine and work that allows her to avoid fast-paced tasks such as assembly line jobs involving production quotas. The claimant is limited to occasional interaction with the public, coworkers and supervisors. The claimant is limited to frequent fingering, grasping, handling and reaching. The claimant has to avoid working around hazards such as moving dangerous machinery and unprotected heights.  The claimant has to avoid concentrated exposure to respiratory irritants, extreme temperatures and humidity.

(R. 18).  At step four, the ALJ concluded that Plaintiff is unable to perform any past relevant work.

(R. 24).  At step five, the ALJ found work in the national economy Plaintiff could perform and therefore found that she was not disabled.  (R. 25).

C.    **The ALJ's Evaluation of the Opinion Evidence in the Record Complies with the Controlling Regulations and is Supported by Substantial Evidence.**

Plaintiff argues that the ALJ's RFC determination is unsupported by substantial evidence and alleges two related instances where the ALJ erred in evaluating the medical opinion evidence. First, Plaintiff contends that the ALJ rejected the record opinion evidence from Dr. Stearns and state agency medical consultants and "inserted his own lay opinion." Pl. Br. (ECF No. 12, at 9). Second, Plaintiff argues that the record does not include an expert opinion considering her "complex diagnostic studies and findings," and thus the ALJ's "only option was to insert his own lay medical opinion." Id. at 11. According to Plaintiff, these actions contravene Fourth Circuit precedent[7] which prohibit an ALJ from (1) disregarding all record medical opinions and relying on their own lay expertise; and (2) drawing conclusions from clinical findings or medical imaging. Pl.'s Br. (ECF No 12, at 9–10).

1.    **The ALJ Did Not Insert His Own Lay Opinion for That of Medical Professionals.**

Under the applicable regulations,[8] the ALJ does "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s) . . . ." 20 C.F.R. § 404.1520c(a). Instead, the ALJ considers their overall "persuasiveness," id., and while the ALJ may consider many factors in evaluating persuasiveness, he or she must explain only "the most important factors" of "supportability and consistency," § 404.1520c(b)(2). Supportability evaluates whether a medical source supports his or her opinion with "objective medical evidence and supporting explanations," § 404.1520c(c)(1), while

---

[7] As discussed below, to support these arguments, Plaintiff cites to Wilson v. Heckler, 743 F.2d 218, 221 (4th Cir. 1984) and Arakas v. Comm'r, Soc. Sec. Admin, 983 F.3d 83, 108–09 (4th Cir. 2020).
[8] On January 18, 2017, the SSA adopted new rules for considering medical opinions and prior administrative medical findings. 20 C.F.R. § 404.1520c. The new rules apply to all claims filed after March 27, 2017. Id. Because Plaintiff protectively filed her claims on March 5, 2020, (R. 224), the new rules apply.

consistency evaluates whether "evidence from other medical sources and nonmedical sources" also support the source's opinion, § 404.1520c(c)(2).

Here, when explaining his RFC determination, the ALJ stated that she considered "the medical opinion(s) and prior administrative medical finding(s) in accordance with the requirements of 20 CFR 416.920(c)." (R. 18). Then, the ALJ stated she was "not persuaded by Dr. Stearns' opinion" because:

> [a]lthough he was asked to review the claimant's entire record, he did not identify any of the claimant's upper extremity impairments or her cervical spine disorder. It is therefore not clear if his opinion is supported by a review of the entire record. Furthermore, heavy work is very inconsistent with the record. The lifting and carrying required at this level would place far too much strain on the claimant's cervical spine, right elbow, bilateral wrists, back, hips, and knee. While the undersigned does not find the evidence fully consistent with the claimant's allegations, she does have significant pathology in multiple joints for which she has complained of pain and stiffness.

(R. 23). In other words, the ALJ partially rejected Dr. Stearns' opinion–finding Plaintiff <u>more limited,</u> by her orthoepic conditions. Plaintiff does not articulate a basis for challenging the ALJ's evaluation of Dr. Stearns' opinion, but instead turns to the ALJ's evaluation of the medical consultants' opinions which the ALJ found "partially persuasive." Pl.'s Mem. (ECF No. 12, at 9); <u>see also</u> (R. 23). Plaintiff then quotes the ALJ's remarks concerning the State Agency opinions noting that both limited Plaintiff to the light exertional level:

> The undersigned does find light exertion generally to be consistent with the claimant's course of treatment. However, the claimant complains of pain with walking, standing, and sitting, and she has pathology in her low back and lower extremities that could cause this pain, which is further exacerbated by her obesity. The undersigned thus finds additional limitations to be more consistent with the record.

Pl.'s Mem (ECF No. 12, at 9) (quoting R. 23). Again, the ALJ's partial discrediting of the Agency opinions resulted in greater limitations, and a more restrictive RFC. Plaintiff insists that, when the ALJ noted Plaintiff's complaints and accordingly imposed additional limitations, he improperly

inserted his own opinion which is contrary to Fourth Circuit precedent.  Pl.'s Mem. (ECF No. 12, at 9) (citing Wilson v. Heckler, 743 F.2d 218, 221 (4th Cir. 1984)).

The Fourth Circuit's opinion in Wilson is readily distinguishable from the present case.  In Wilson, the ALJ "erroneously exercised an expertise he did not possess in the field of orthopedic medicine."  743 F.2d at 221.  The ALJ in Wilson found that the clinical findings of the claimant's examining physician did not support the severity of the limitations included in the physical capacities' evaluation.  Id.  In the present case, however, the ALJ did not substitute his opinion for Dr. Stearns' or the state agency experts', but instead evaluated the evidence as a whole, which is his duty, and provided additional functional limitations also supported by the medical evidence.  (See R. 23).  The ALJ noted that the state agency opinion was "supported by appropriate summaries of the medical evidence that existed at the time, but additional evidence has been obtained at the hearing level" that warrants including additional limitations.  (R. 23).  Unlike in Wilson, here new evidence was introduced and included in the record that the state agency consultants did not consider, and thus it was the ALJ's responsibility to account for this new evidence in his findings.  Id.

Additionally, unlike in Wilson where the ALJ rejected limitations and found the claimant was capable of more activity, the ALJ here determined that the medical experts failed to include sufficient limitations in Plaintiff's RFC to account for her medically determinable impairments.  Id.; see also 743 F.2d at 221.  For example, Dr. Stearns found Plaintiff "is capable of heavy exertional activities," and "has no limitations in reaching, handling, fingering, feeling, or pushing and pulling with her upper extremities."  (R. 23).  The ALJ explained that she was "not persuaded by Dr. Stearns opinion," because despite being "asked to review the claimant's entire record, [Dr. Stearns] did not identify and of claimant's upper extremity impairments or her cervical spine

disorder," and thus it is "not clear if his opinion is supported by a review of the entire record." Id.
Furthermore, after reviewing the record, the ALJ concluded that "heavy work is very inconsistent
with the record" and "would place far too much strain on the claimant's cervical spine, right elbow,
bilateral wrists, back, hips, and knee." Id. Similarly, the ALJ imposed additional functional
limitations not included in the state agency medical consultants' opinion. (R. 23). The ALJ agreed
with the state agency medical consultants that Plaintiff can perform light work but noted that
"additional evidence" was obtained since the state agency consultants rendered their opinions, and
consistent with this new evidence, the ALJ imposed further limitations including that "claimant is
limited to walking no longer than a block at a time on a flat even surface," "she is given a sit-stand
option for comfort," "given her neck pain and upper extremity impairments, limitations on
reaching and manipulative activities are appropriate," "[c]rawling and climbing ladders would be
too difficult for the claimant given all of her joint pains," "environmental limitations are
appropriate," and claimant "should avoid hazards out of caution given her inability to move
quickly." Id. The ALJ here properly considered and applied the factors of supportability and
consistency to both Dr. Stearns and the state agency medical consultants' opinions.

Regarding her second argument, Plaintiff contends that the ALJ inserted his own lay
medical opinion in the absence of an expert opinion considering her "complex diagnostic studies
and findings." Pl.'s Mem (ECF No. 12, at 11). Plaintiff argues that the record does not include
an expert opinion evaluating these studies or findings, and thus the "ALJ's only option was to
insert his own lay medical opinion" to craft the RFC. Id. Accordingly, Plaintiff contends that the
RFC is not supported by substantial evidence and the ALJ's actions contravene Fourth Circuit
precedent which prohibit an ALJ from drawing their own conclusions from medical imaging. Id.
at 10 (citing Arakas, 983 F.3d at 108–09 (4th Cir. 2020)).

However, this case is readily distinguishable from <u>Arakas</u>.  In <u>Arakas</u>, the claimant's rheumatologist concluded that her MRI showed clear evidence of chronic cervical spasm.  983 F.3d at 92.  The ALJ improperly rejected the rheumatologist's finding and inserted his own belief "that an MRI would not document a chronic condition of spasm."  <u>Id.</u> at 109.  In this case, unlike <u>Arakas</u>, the ALJ here did not correct a perceived error by a medical professional, <u>see id.</u>, nor does Plaintiff identify any instances when this occurred.  <u>See generally</u> Pl.'s Mem (ECF No. 12); Pl.'s Reply (ECF No. 15).  Plaintiff lists various examples of diagnostic studies in the record, see Pl.'s Br. (ECF No 12, at 10–11), but Plaintiff does not list a single example of the ALJ "correcting" those findings, or making her own medical determinations based upon them.  Instead, Plaintiff provides a blanket statement that "the ALJ in this case was not qualified to interpret electromyography and nerve conduction studies [] into functional limitations without the guidance of a medical professional," but does not indicate where the ALJ made such a determination.  Pl.'s Reply (EF No. 15, at 3–4).  Furthermore, as noted by the Commissioner, Dr. Stearns reviewed Plaintiff's entire medical record on December 6, 2021.  Def.'s Br. (ECF No. 14, at 20).  Plaintiff argues that no expert considered her electromyography and nerve condition studies, but these studies were conducted on February 5, 2021.  Pl.'s Br. (ECF No. 12, at 5).  In fact, all relevant testing and medical evaluations cited by Plaintiff occurred before December 6, 2021, and thus were included in the record reviewed by Dr. Stearns.  <u>See id.</u> at 5–6.

Here, the ALJ reviewed the clinical findings and weighed their significance in assessing the credibility of other evidence to conclude whether Plaintiff was disabled, which is her role.  Additionally, reversal is not warranted simply because the record contains evidence which could support a conclusion opposite from the one reached by the ALJ.  The court must defer to the ALJ's findings if those findings are supported by substantial evidence.  <u>Perales</u>, 402 U.S. at 390; <u>see also</u>

Lewis, 858 F.3d at 865.  This appeal is not an opportunity to relitigate the case.  If "conflicting evidence allows reasonable minds to differ as to whether [Plaintiff] is disabled," then the court defers to the ALJ.  Craig, 76 F.3d at 589 (quoting Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987)).  Because the ALJ's opinion here is supported by substantial evidence, the court does not consider whether the evidence might also support an alternative finding.

## V.    RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the court DENY Plaintiff's Motion for Summary Judgment (ECF No. 11), and AFFIRM the final decision of the Commissioner.

## VI.    REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, see 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  See Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.    A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this court

based on such findings and recommendations. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Carr v. Hutto</u>, 737 F.2d 433 (4th Cir. 1984); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

/s/

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
September 25, 2023